The LAGUNA GREENBELT, INC., a California Non–Profit Corporation; The Laguna Canyon Conservancy, a California Non–Profit Corporation; Stop Polluting Our Newport, a California Non–Profit Corporation; Save Our San Juan, a California Non–Profit Corporation, Plaintiffs–Appellants,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION; Secretary of the United States Department of Transportation; Federal Highway Administration; Administrator of the Federal Highway Administration; Regional Administrator, Region IX, of the Federal Highway Administration; San Joaquin Hills Transportation Corridor Agency, Defendants–Appellees.

No. 94–55757.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 13, 1994.

Decided Dec. 2, 1994.

As Amended Dec. 20, 1994.

Order Denying Rehearing and
Dissolving Injunction Dec. 20, 1994.

Joel R. Reynolds, Natural Resources Defense Council, Inc., Craig S. Bloomgarden, Heller, Ehrman, White & McAuliffe, Los Angeles, CA, Mark I. Weinberger, Shute, Mihaly & Weinberger, San Francisco, CA, for plaintiffs-appellants.

Ellen J. Durkee, John T. Stahr, U.S. Dept. of Justice, Washington, DC, for federal defendants-appellees.

John J. Flynn III, Robert D. Thornton, Nossaman, Guthner, Knox & Elliott, Irvine, CA, for defendant-appellee San Joaquin Hills Transp. Corridor Agency.

Before: FEINBERG,* SCHROEDER, and KOZINSKI, Circuit Judges.

## ORDER

Appellants' petition for rehearing is denied. This court's injunction is dissolved forthwith. Appellants' suggestion for rehearing en banc will be considered in due course.

The opinion filed on December 2, 1994 is hereby amended as follows:

[Editors Note: Amendments incorporated for purposes of publication]

## OPINION

PER CURIAM:

The Laguna Greenbelt, Inc., The Laguna Canyon Conservancy, Stop Polluting Our Newport, and Save Our San Juan are four non-profit community organizations (collectively "Laguna") that appeal the district court's grant of summary judgment in favor of the U.S. Department of Transportation, the Federal Highway Administration (FHA), and the San Joaquin Hills Transportation Corridor Agency (TCA). Laguna contends that the FHA violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., by approving the Environmental Impact Statement (EIS) for the tollroad and by failing to prepare a Supplemental Environmental Impact Statement (SEIS) to address the effect of wildfires that broke out in the Laguna Greenbelt region after the EIS was approved. Laguna further contends that the FHA violated section 4(f) of the Transportation Act, 49 U.S.C. § 303(c), which governs the use of parkland for transportation projects.

## BACKGROUND

### Tollroad Description and Location

The San Joaquin Hills transportation corridor, as approved by the FHA, is a proposed 17.5 mile highway that will run parallel to the Pacific coastline from Newport Beach to San Juan Capistrano, California, where it will connect with Interstate 5. The corridor is the first highway of its type in California to be financed without any federal funding and with limited state funding. It will operate as a tollroad only until construction bonds are paid off. The federal appellees' interest in the project arises solely from the highway's connection with Interstate 5.

The tollroad is designed to relieve traffic congestion and high levels of air emissions on the freeway system and on local arterial highways in south Orange County. Between 1950 and 1989, the population of Orange County grew by 2.1 million, while only four miles were added to the freeway system in the 16 years preceding 1990. The tollroad will consist of six general use lanes, two high occupancy vehicle lanes for buses and carpools, and a median varying from 88 to 116

* The Honorable Wilfred Feinberg, Senior United States Circuit Judge for the Second Circuit, sitting by designation.

feet wide for future rail transit use. A five-foot chain-link fence will run the tollroad's entire length, hindering movement across the road by most wildlife species. Grading for the tollroad will cut a strip up to 1,300 feet wide in places and require movement of over 40 million cubic yards of earth, significantly altering the topography and appearance of the land.

### Laguna Greenbelt

Approximately five miles of the tollroad (the middle section) will bisect a 16,000 acre undeveloped area in the San Joaquin and Sheep Hills of coastal Orange County called the Laguna Greenbelt. The tollroad will also use 1.7 acres of the University of California, Irvine Ecological Reserve (the "reserve"). The Greenbelt is the last significant open space in Orange County and possesses ecological, recreational and scenic value. It consists of parks, recreational areas and wildlife preserves, and encompasses eight coastal canyons, a permanent stream and the only natural lakes in Orange County. The Greenbelt includes a stand of coastal sage scrub, which serves as a habitat for the Coastal California Gnatcatcher (a species of bird listed as threatened under the Endangered Species Act), as well as for several sensitive species currently or previously under review for listing, including the Coastal Cactus Wren, the California Mastiff Bat, the San Diego Coast Horned Lizard and the Orange–Throated Whiptail Lizard. Rare or endangered plants, such as Orange County Turkish Rugging and Many–Stemmed Dudleya, have also been found in the region.

### Approval Process

Since at least 1976, Orange County and the cities along the proposed corridor route have evaluated transportation options in the region and included the corridor in their long-range planning documents. Some parklands were planned and acquired in transactions that reserved the corridor right of way or required dedication of land for the corridor.

Three state Environmental Impact Reports (EIR) were prepared prior to the joint federal EIS/state EIR at issue here.[1] In response to the third state EIR, the cities of Newport Beach and Irvine proposed reducing the number of lanes from 12 to a maximum of eight, including high occupancy vehicle lanes, and reserving space in the median for rail transit. The proposal was adopted.

In September 1990, a draft of the EIS and section 4(f) analysis at issue here was released for public comment. The Environmental Protection Agency (EPA) gave the document a low rating for failure to provide enough information to adequately assess significant environmental impacts. The U.S. Fish & Wildlife Service (FWS) and the California Coastal Commission also criticized the document. In response, the FHA engaged in further consultation with the agencies, including additional assessments of the air quality and growth-inducing effects of the corridor, the biological impact of the corridor on a pair of Least Bell's vireos (an endangered bird species) and the implementation of wetlands mitigation measures. After another public comment period, the FHA approved the final EIS, the section 4(f) analysis, and the tollroad in a July 6, 1992 Record of Decision. The FHA subsequently consulted with the FWS on two additional bird species—the gnat-catcher and cactus wren.

### Court Review

In January 1993, Laguna filed a complaint for declaratory and injunctive relief in the district court, challenging the FHA decision to approve the tollroad.[2] Shortly thereafter, TCA sold $1.2 billion in revenue bonds and notified its contractor to proceed with final plans for construction. Laguna moved for a temporary restraining order and a preliminary injunction, which the district court

1. The California Environmental Quality Act (CEQA), Cal.Pub.Resources Code § 21000 et seq., is California's version of NEPA and requires an EIR rather than an EIS.

2. State court actions challenging state or local agency approval of the joint EIS/EIR under state law and one other federal action challenging FWS approval of the corridor, *Natural Resources Defense Council v. U.S. Dept. of Interior,* No. SA–CV–93–999–LHM (C.D.Cal. filed Sept. 29, 1993), have also been filed.

granted, prohibiting any activity in connection with construction of the corridor in the Laguna Greenbelt and in the reserve.[3]

In October 1993, wildfires swept through the Laguna Greenbelt region. The district court postponed proceedings to allow the FHA to address this issue. The FHA reinitiated consultation on the gnatcatcher and cactus wren, obtained other evaluations, and, on March 7, 1994, issued a Memorandum of Record concluding that an SEIS was not necessary to address the effect of the wildfires on the tollroad's environmental impacts. The district court granted Laguna leave to amend its complaint to challenge that decision.

The district court eventually granted the FHA's and TCA's motions for summary judgment, denied Laguna's motion for summary judgment, dissolved its preliminary injunction, and denied a stay. We, however, enjoined construction activities in the Laguna Greenbelt and the reserve pending disposition of this appeal. We later granted the parties' stipulation to modify the injunction to permit certain salvage and surveying activities.

## DISCUSSION

### I

### Standard of Review

We review de novo the district court's determination that the EIS complies with NEPA and that no SEIS was required. *Oregon Envtl. Council v. Kunzman,* 817 F.2d 484, 493 (9th Cir.1987). We also review de novo the district court's determination that the FHA complied with section 4(f) of the Transportation Act. *See Arizona Past & Future Found., Inc. v. Lewis,* 722 F.2d 1423, 1425–26 (9th Cir.1983).

### II

### Environmental Impact Statement

Laguna challenges the EIS for failing to: (a) analyze all reasonable alternatives to the

tollroad; (b) disclose the growth-inducing impacts of the tollroad; (c) accurately analyze the need for the tollroad, the air quality and traffic impacts of the tollroad, and the "no project" alternative to the tollroad; (d) disclose the impact of the tollroad on the reserve; (e) disclose the effectiveness of mitigation measures discussed in the EIS; and (f) use a rational and consistent definition of the project and its affected environment in analyzing the tollroad's impacts.

■ Before we turn to consider each of these contentions, we note that NEPA does not mandate particular substantive results, but instead imposes only procedural requirements. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). Thus, in considering a challenge under NEPA, "[we] may not substitute [our] judgment for that of the agency concerning the wisdom or prudence of a proposed action." *Kunzman,* 817 F.2d at 492. Under our "rule of reason," we determine " 'whether the [EIS] contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences' by making 'a pragmatic judgment whether the [EIS's] form, content and preparation foster both informed decision-making and informed public participation.' " *Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346, 1356 (9th Cir.1994) (quoting *California v. Block,* 690 F.2d 753, 761 (9th Cir.1982)).

### A. Discussion of alternatives

Laguna contends that the EIS's presentation and evaluation of alternatives set forth insufficient information to satisfy the requirements of NEPA.

### 1. Number of alternatives

■ First, Laguna contends the EIS violates NEPA by discussing only three alternatives for the tollroad project: the proposed corridor, one other "build" alternative, and

---

**3.** The district court enjoined construction only as to the one-third section of the tollroad that bisects the Greenbelt and the portion of the tollroad that uses the reserve. Construction began

in September 1993 and has continued throughout this litigation on the remaining two-thirds of the tollroad. According to TCA, over $200 million has been spent thus far.

the "no-build" or no project alternative.[4] The EIS required by NEPA must discuss alternatives to the proposed action. 42 U.S.C. § 4332(2)(C)(iii). NEPA's implementing regulations require that the EIS "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a).

Here, the EIS discusses in detail two build alternatives: the proposed corridor, AR 30:012818–49, 875–77, and a second option following the same alignment and having the same general lane configuration, but differing somewhat in its operation and method of connecting with Interstate 5, AR 30:012818, 850–51, 875–77.[5] The EIS also discusses a third option, the no-build alternative. AR 30:012851, 875.

■ In addition, the EIS discusses six categories of alternatives that were evaluated in earlier environmental documents or in the course of the joint EIS/EIR but were eliminated from more detailed analysis and ultimately rejected. AR 30:012851–75, 30:013055–68.[6] All were rejected as not feasible or failing to meet the project's objective of reducing traffic congestion and air emissions. For example, with respect to alternatives that would do more than simply alter the route of the proposed tollroad, carpools and high occupancy vehicle lanes were found incapable of accommodating traffic demand or eliminating the need for the corridor. AR 30:012854–55. Widening of existing highways in the region was found to have adverse impacts on adjacent routes and on the community. AR 30:012857–63.

■ Thus, the EIS discusses in detail all the alternatives that were feasible and briefly discusses the reasons others were eliminated. This is all NEPA requires—there is no minimum number of alternatives that must be discussed. *See, e.g., Tongass Conservation Society v. Cheney*, 924 F.2d 1137, 1140–42 (D.C.Cir.1991) (upholding EIS where 13 of 14 sites eliminated with only brief discussion because only one site feasible).

### 2. Range of alternatives

■ Second, Laguna contends the EIS fails to consider a broad range of other alternatives that were reasonable. However, the concept of alternatives is "bounded by some notion of feasibility." *Vermont Yankee*, 435 U.S. at 551, 98 S.Ct. at 1215. The range of alternatives that must be considered in the EIS need not extend beyond those reasonably related to the purposes of the project. *City of Angoon v. Hodel*, 803 F.2d 1016, 1021–22 (9th Cir.1986).

■ Here, Laguna contends the EIS ignored a smaller, four-lane alternative that included special pricing mechanisms to reduce traffic congestion, an alternative which was proposed during the comment period by its expert, Dr. Gordon Fielding. *See* AR 32:013598–99. However, Fielding's proposal was addressed in the EIS, in response to his comments. AR 34:014764–65. The EIS explains that Fielding's proposal was rejected because a four lane highway would not meet the project's goal of reducing traffic conges-

---

4. Laguna also contends that the FHA at the outset deliberately determined to defer to TCA's preferred alternative for the tollroad, choosing to focus only on minor adjustments in the tollroad's alignment and on the no-build alternative. This argument is based on an internal FHA memorandum dated seven years before the draft EIS was even released. *See* Administrative Record (AR) 1:000015. Thus, it goes only to the FHA's intention or predisposition in drafting the EIS. It is irrelevant where, as here, the EIS itself ultimately satisfies the requirements of NEPA.

5. Laguna refers to the second build alternative as a massive 10–14 lane highway set up as a "straw man" to make the proposed tollroad appear reasonable and environmentally superior by comparison. The second build alternative, however, is described throughout the EIS as having the same lane configuration as the proposed tollroad—six general use lanes plus two high occupancy vehicle lanes. Only at one map cited by Laguna is it described as having 10–14 lanes. *See* AR 30:012841.

6. Laguna contends that reliance on prior state environmental documents was improper because the federal agency must analyze the environmental impacts and alternatives under NEPA. However, NEPA mandates state and federal coordination of environmental review. *See* 40 C.F.R. § 1506.2(b). Here, the absence of a more thorough discussion in the EIS of alternatives that were discussed in and rejected as a result of prior state studies does not violate NEPA.

tion, even if Fielding's special pricing mechanisms were used.[7] Thus, Fielding's proposal was properly rejected as not reasonably related to the purposes of the project. *See, e.g., North Buckhead Civic Ass'n v. Skinner,* 903 F.2d 1533, 1541–43 (11th Cir.1990) (upholding EIS that failed to include detailed discussion of infeasible rail-only alternative).

▮ Laguna also contends the EIS should have considered whether a highway could be designed that had the proposed tollroad's operational characteristics but incorporated bridges, tunnels, split levels, and other options to minimize the tollroad's environmental impacts. *Cf. Coalition for Canyon Preservation v. Bowers,* 632 F.2d 774, 783–84 (9th Cir.1980) (EIS for highway-widening to four lanes inadequate for failure to discuss two lane alternative that was reasonable and obvious because it was the original proposal and would have spared parkland). An EIS need not consider every conceivable alternative, however, nor remote and speculative alternatives whose effects cannot be readily ascertained. *See Vermont Yankee,* 435 U.S. at 551, 98 S.Ct. at 1215–16.

Here, Laguna's suggestions are not reasonable or obvious. For example, Laguna contends the FHA should have investigated reducing the size of the tollroad's median, thus narrowing the tollroad and possibly limiting encroachment on parkland. The size of the median was chosen to accommodate rail transit. Because of rail's positive environmental attributes, it would not be reasonable to eliminate availability of the median for potential rail transit. Moreover, Laguna's contention that this would save parkland is speculative at best.

Laguna further contends the FHA did not consider a proposal to bridge every canyon along the route with elevated highway segments to permit wildlife corridors. *See* AR 33:014291. The FHA did respond to this comment, however, *see* AR 34:014840–46, and

additional wildlife crossings were incorporated into the final design. *Id.*

Thus, while Laguna points to some alternatives that might have been considered or discussed more fully, the "detailed statement of alternatives cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable." *Vermont Yankee,* 435 U.S. at 551, 98 S.Ct. at 1215–16 (internal quotation marks omitted). The record reflects that the EIS contains a reasonably thorough discussion of alternatives satisfying the goals of the project.

### B. Growth-inducing impacts of the tollroad

▮ Laguna contends that the discussion of growth-inducing impacts in the EIS sets forth insufficient information to satisfy the requirements of NEPA. *See* 40 C.F.R. §§ 1502.16(a) & (b), 1508.8(b) (EIS must discuss direct and indirect effects on environment; indirect effects include growth inducing effects and other effects relating to induced changes in the pattern of land use, population density or growth rate). Specifically, Laguna contends the EIS's conclusion that the tollroad will not influence growth in Orange County is misleading because it is based on local planning documents that assume the existence of the tollroad.

The discussion and documentation in the EIS, however, support the EIS's conclusion that the tollroad will not affect the amount and pattern of growth in Orange County. The EIS relied upon evidence that Orange County has already experienced substantial growth, and that the county is expected to continue to grow in the future, although at a declining rate. AR 31:013173. The record shows that 98.5% of all land in the project's "area of benefit" is already accounted for by either existing or committed land uses not contingent on construction of the corridor. AR 31:013180.[8]

---

7. The EIS also considered and rejected another down-sized alternative as not suitable, AR 30:012863, and the proposed tollroad itself incorporates a reduction in the number of lanes in response to comments on the draft EIS, AR 29:012282–89.

8. Laguna disputes this, contending that development agreements or other entitlements merely authorize development, and do not require or guarantee it, and that developers may not go through with plans if the tollroad is not built. This argument is not supported by the record.

The cases Laguna cites in support of its contention, *Coalition for Canyon Preservation*, 632 F.2d at 782 & n. 3 (EIS violates NEPA where it contains unsupported, conclusory statement that pollution would increase with or without project), and *City of Davis v. Coleman*, 521 F.2d 661, 674–77 (9th Cir.1975) (failure to prepare EIS violates NEPA where agency simply stated highway was accessory to inevitable industrial development), are inapposite. We have distinguished these cases where, as here, an EIS's discussion of growth-inducing impacts was reasonably thorough. *See Stop H–3 Ass'n v. Dole*, 740 F.2d 1442, 1461–62 (9th Cir.1984), *cert. denied*, 471 U.S. 1108, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985).

▆ While there are weaknesses in the EIS's analysis of growth-inducing impacts,[9] these weaknesses do not prevent us from concluding that the discussion of growth-inducing impacts in the EIS easily meets our "rule of reason." *See Salmon River*, 32 F.3d at 1356. NEPA does not require us to decide whether an EIS is based on the best scientific methodology available or to resolve disagreements among various experts. *See Kunzman*, 817 F.2d at 496. While Laguna may disagree with the EIS's substantive conclusion regarding growth-inducing impacts, the EIS's discussion of those impacts was reasonably thorough.

### C. Need for tollroad, air quality and traffic impacts, and no-build alternative

▆ Laguna claims that the EIS contains insufficient data and analysis regarding the need for the tollroad, its air quality and traffic impacts, and alternatives to the project. Laguna contends that the EIS's analysis of these issues is flawed because it purports to reflect a comparison between the environment with and without the tollroad through the year 2010, but in fact does not allow for the alternative that the tollroad will

not be built. *See* 40 C.F.R. § 1502.14 (EIS must present environmental impacts of proposed project in comparative form, sharply defining issues and providing clear basis for choice among options).

Laguna contends that the traffic projections used in the EIS fail to provide a true comparison with the no project alternative because they assume the corridor will be in operation by 1995, resulting in projections of congestion and air pollution that can only be relieved by the project itself. *But see* AR 30:012806–07 (Table 1.3.A—Existing and Estimated 2010 Traffic on I–405, SR–1, and I–5 With and Without the Corridor); AR 30:012810–11 (Table 1.3.C—Existing and Estimated Traffic on Selected Arterial Highways With and Without the Corridor); AR 30:012808–12 (discussion of roadway capacity deficiencies addressing existing and future traffic with and without Corridor). Specifically, Laguna contends the traffic projections are flawed because they are based on population and housing data that assume existence of the tollroad. The record reveals that the Orange County Preferred 1988 Population and Employment Projections (OCP–88) were used to formulate the traffic projections for 1995 and 2010 discussed in the EIS, and the OCP–88 states as a general assumption that operation of the corridor will begin by 1995. *See* AR 31:013148; *see also* AR 31:013173 ("all projections and forecasts from both Orange County and [the Southern California Association of Governments] reflect construction of the Corridor").

Nevertheless, the FHA did not violate NEPA by relying on the OCP–88. *See Stop H–3 Ass'n*, 740 F.2d at 1464–65 (EIS can rely on official demographic projections for the region at issue, even where projections subsequently revised downward). The need for the corridor is based on existing as well as future traffic congestion, AR 30:012808–09, and the county's population probably will grow in the coming years even without the

---

9. For example, Laguna is correct that the EIS's conclusions regarding the amount and pattern of growth in Orange County were based on planning documents that assume the corridor would be built. The EIS also acknowledges that the corridor has already affected growth in Orange County, since it was identified on the Master Plan of Arterial Highways in 1976 and subsequently incorporated into local planning documents. Finally, the EIS admits that the corridor may affect the rate, if not the amount and pattern, of growth in Orange County by permitting development to proceed more quickly. *See* AR 31:013181.

corridor, *see* AR 31:013173 (population increased by 2.1 million from 1950 to 1989 with little highway improvement); *see also Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430, 442 (5th Cir.1981) (EIS based on high population projections upheld; current as well as future need for highway was shown and all parties anticipated some population growth). Thus, we conclude that this aspect of the EIS complies with NEPA as well.

### D. Disclosure of tollroad's impact on the University of California, Irvine Ecological Reserve

 Laguna next contends that the EIS does not disclose that 1.7 acres of the reserve will be taken for tollroad right-of-way.[10] The closest the EIS comes to disclosing use of 1.7 acres of the reserve is: (1) a statement that "impacts to current [University land] uses would be limited to the intrusion of the Corridor's alignment (approximately 200–300 feet) onto UCI property near the Bonita Canyon Reservoir," AR 30:013082; (2) a similar statement made in response to a comment that "[t]he purpose of going onto UCI property is to reduce impacts to wetlands," AR 35:015197; and (3) the listing of the University among agencies from which permits and approvals would have to be obtained, AR 30:012787.

The EIS also discusses the corridor's impact on University land generally, without specifically describing the taking of a portion of the reserve. *See* AR 30:013032 (discussing impacts to plant communities). Various comments on the EIS by University spokespersons and the public, along with TCA's responses to them, all of which were circulated to the public, also allude to taking of the reserve. *E.g.,* AR 32:013603–04 (MacMillen letter); AR 32:013641–44 (Schwartz letter); AR 33:014286–98 (Bowler letter); AR 34:014862–63 (responses).

 While none of these citations mentions the reserve by name or describes the 1.7 acre parcel, this technical non-disclosure

does not require reversal. In determining whether NEPA has been violated, we must look to the ultimate harm NEPA seeks to prevent: the risk of damage to the environment that results if the agency fails to properly and thoroughly evaluate the environmental impacts of a proposed project. *See, e.g., Sierra Club v. Marsh,* 872 F.2d 497, 500 (1st Cir.1989). Thus, even where there is a violation of NEPA's procedural requirements, relief will not be granted if the decision-maker was otherwise fully informed as to the environmental consequences and NEPA's goals were met. *See, e.g., Warm Springs Dam Task Force v. Gribble,* 621 F.2d 1017, 1023 (9th Cir.1980).

The non-disclosure here did not frustrate NEPA's goal of ensuring that relevant information is available to the wider audience participating in agency decision-making. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 (1989). It is clear that members of the public had sufficient information regarding the tollroad's impact on the reserve to submit comments upon it; the FHA in turn was informed about the impact on the reserve before it made its final decision. In addition, this litigation itself has offered further opportunities for public involvement in the education of agency decision-makers, curing defects that might have existed in the EIS. *Cf.* Hon. James L. Oakes, *The Judicial Role in Environmental Law,* 52 N.Y.U.L.Rev. 498, 515–16 (1977) (judicial review under NEPA is one part of ongoing political process in which all sides can seek to influence outcomes through multiplicity of channels). Failure of the EIS to disclose accurately the tollroad's impacts on the reserve does not constitute reversible error here.

### E. Effectiveness of mitigation measures

 Laguna contends that the information provided in the EIS on mitigation measures and their likely efficacy fails to satisfy the requirements of NEPA. Specifically, La-

---

**10.** Laguna also contends the EIS makes affirmative misrepresentations about the use of the reserve. This contention is based on a misreading of the record. For example, where the EIS

claims that "existing UCI land uses are not located near the Corridor," it is clear that the EIS is discussing developed land use, not the reserve. *See* AR 30:013082.

guna claims the EIS fails to disclose clearly enough that measures to mitigate the adverse environmental impacts of the tollroad may not be effective, therefore misleading the reader about the extent of harm caused by the tollroad.

■ An EIS must include a detailed statement regarding any adverse environmental effects that cannot be avoided. 42 U.S.C. § 4332(2)(C)(ii). Implicit in this requirement is an understanding that the EIS will discuss the extent to which steps can be taken to mitigate adverse environmental consequences. *Methow Valley Citizens Council,* 490 U.S. at 351–52, 109 S.Ct. at 1846–47. Omission of a reasonably complete discussion of possible mitigation measures would undermine the action-forcing function of NEPA and prevent the agency and interested parties from properly evaluating the severity of the adverse effects. *Id.* at 352, 109 S.Ct. at 1847.

■ However, NEPA does not require a fully developed plan that will mitigate all environmental harm before an agency can act; NEPA requires only that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fully evaluated. *Id.; see also Communities, Inc. v. Busey,* 956 F.2d 619, 625–26 (6th Cir.) (EIS lacking complete remediation plan adequate where sufficient investigation was conducted to identify mitigation alternatives and make reasonable estimate of cost), *cert. denied,* — U.S. —, 113 S.Ct. 408, 121 L.Ed.2d 332 (1992); *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 205–06 (D.C.Cir.) (agency not required to finish mitigation studies or execute mitigation plans before project begins), *cert. denied,* — U.S. —, 112 S.Ct. 616, 116 L.Ed.2d 638 (1991).

■ The EIS contains a reasonably complete discussion of potential mitigation measures. Laguna concedes that the EIS pro-

poses re-planting coastal sage scrub, AR 30:013045, 49, and using several bridges to maintain wildlife corridors, AR 30:012790, 013046–47. Indeed, the EIS includes a long discussion of environmental impacts and potential mitigation measures. AR 30:012955–013147. The EIS also discloses that mitigation measures may not be totally successful. It states as to habitat revegetation that complete mitigation "would be difficult due to the large size of the impacted area and poor likelihood of successful regeneration," and that the loss of certain habitats "will only be partially mitigated." AR 30:013041. The EIS also states that maintenance of wildlife corridors "will help" alleviate impacts, AR 30:013044, but acknowledges unavoidable adverse impacts, AR 30:013054. As to wetland mitigation measures, the EIS states that "[m]ost mitigation projects in the vicinity of the Corridor have not been established for a long enough period to determine whether they will ultimately be successful." AR 30:013069. Under *Methow Valley Citizens Council,* this discussion of mitigation measures was reasonably thorough and sufficient, and thus satisfies NEPA.[11]

## F. Definition of the project and its affected environment

■ Laguna contends that the EIS's varying descriptions of the project's area of impact violate NEPA's requirement of fair and adequate disclosure.

Regulations promulgated under NEPA provide that the EIS "shall succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration." 40 C.F.R. § 1502.15. Laguna does not contend there is a legal requirement that the EIS use the same description throughout. Rather, its argument is based on *Sierra Club v. Sigler,* 695 F.2d 957, 975–83 (5th Cir.1983), where an EIS that failed to analyze all adverse impacts or cumulative

11. Laguna also contends the EIS improperly contains assurances that mitigation will succeed which are not based on scientific evidence or studies, violating NEPA regulations that require the EIS to be supported by evidence that agencies have made the necessary environmental analyses, 40 C.F.R. § 1500.2(b), and provide that in evaluating adverse impacts in an EIS, the

agency shall make clear where information is incomplete or unavailable, 40 C.F.R. § 1502.22. The cases Laguna cites, however, do not involve mitigation measures and thus do not support the argument that scientific uncertainties in mitigation measures must be discussed. We hold they need not.

effects of related projects was found to have resulted in a skewed cost-benefit analysis of the project at issue. Laguna argues that use of an inconsistent definition here resulted in a misleading analysis of the positive and negative effects of the tollroad.

Laguna contends that the EIS describes the area affected by the tollroad as "within 440 yards of either side of the center of the tollroad's alignment" and analyzes the environmental impacts of the tollroad only with respect to this area. This method of analysis, Laguna contends, disregards the width of the grading strip at a particular location, the location's sensitivity, and other construction impacts extending beyond the actual grading strip- and the 880 yard area, thus minimizing the harmful effects of the tollroad. Laguna further contends that the EIS fails to adhere to this narrow definition throughout its discussion of the tollroad's environmental impacts, using a much larger description of the project area to analyze the tollroad's positive air quality and traffic effects. Because this larger area includes other proposed highway improvements in the region, Laguna argues, the positive effects of the tollroad are maximized.

Laguna's assertion that the tollroad's positive effects on air quality and traffic conditions are analyzed using a regional description is correct. *See* AR 30:012806 n. 1. Laguna is also correct that the EIS focuses on an area approximately one quarter mile wide on either side of the proposed corridor centerline in its discussion of certain biological impacts. *See* AR 30:012909. However, the EIS also discusses the corridor's negative impacts on biological resources in an area beyond the half mile area of impact. For instance, the EIS discusses impacts in 12 wildlife movement corridors within and outside the area, AR 30:012932–34, and it discusses the tollroad's effects on plant communities in the San Joaquin Hills, AR 30:013031–32. Thus, the EIS discusses negative impacts on biological resources in a cumulative and regional way as well, and therefore does not present a skewed analysis. *Cf. Sigler*, 695 F.2d at 975–83.

The district court correctly reasoned that for some environmental effects (such as wet-

lands impacts), a smaller area of impact may need to be considered, whereas for others (such as wildlife movement or air quality), a larger area should be studied. We conclude that the EIS's method of describing the tollroad's area of impact resulted in a reasoned analysis of the available data. *See Kunzman*, 817 F.2d at 496.

## III

### Supplemental Environmental Impact Statement

▇ Laguna contends that the FHA violated NEPA by deciding not to prepare an SEIS after the October 1993 fires in the Laguna Greenbelt region.

NEPA regulations require preparation of an SEIS if, among other things, there are significant new circumstances or information relevant to environmental concerns that bear on the proposed actions or its impacts. 40 C.F.R. § 1502.9(c)(1); *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 374, 109 S.Ct. 1851, 1859, 104 L.Ed.2d 377 (1989).

Here, the FHA took the requisite hard look at environmental consequences after the fire. The FHA reinitiated consultation with a coordinating agency, the FWS, on the gnatcatcher and cactus wren, resulting in a new Biological Opinion. *See* Supplemental Administrative Record (SAR) 19–54. The FHA also relied on the expertise of a second agency, the Army Corps of Engineers, which reaffirmed the project's runoff management plan and erosion control measures. *See* SAR 290–92. TCA's biological consultants, LSA Associates, prepared and submitted a report to the FHA. SAR 266–288 (Review of Potential Fire Effects). After reviewing these and other documents, the FHA issued its Memorandum of Record, concluding that the fire had not resulted in any new significant impacts not addressed in the previously approved EIS. SAR 5–17. Thus, it is apparent that, in so doing, the FHA relied on substantial technical expertise possessed by two federal agencies charged with responsibility for the respective sectors of the affected environment. *See Oregon Natural Resources Council*, 490 U.S. at 376–77, 109 S.Ct. at 1860–61.

Laguna's contention that the FHA failed to consider the combined effects of the tollroad and the wildfires on the amount and nature of runoff into downstream water resources is unpersuasive. The Memorandum of Record acknowledges that the fire altered the potential for erosion and runoff in the San Joaquin Hills and that there would be more runoff as a result of the fire. SAR at 9–10. The Army Corps of Engineers determined that existing erosion control measures described in the EIS would be adequate to address the increased runoff. SAR 290–92.[12] Furthermore, a post-fire study of erosion control concluded that because the fire had removed vegetation in the affected drainage areas, there would be an overall increase in the amount of runoff from the burned areas and thus the impact of corridor construction on total runoff would be proportionately smaller. SAR 266–88. The corridor's incremental effect on the downstream water resources would actually be reduced from that analyzed in the EIS. *Id.* The FHA's determination, based on these technical findings, that the tollroad would not have a previously unconsidered effect on erosion and runoff was not arbitrary or capricious. *See Oregon Natural Resources Council,* 490 U.S. at 377, 109 S.Ct. at 1861.

Laguna's second contention, that the FHA improperly concluded that existing mitigation measures were sufficient to address the fire's effect on biological resources, is similarly unpersuasive. Fires are natural occurrences in the Laguna Greenbelt area. The EIS takes the occurrence of fire into account and existing mitigation measures in the EIS consider the possibility of fire. In addition, the FHA reinitiated consultation with the FWS as to the gnatcatcher and cactus wren, the only species that had previously warranted study. Because analysis of these factual issues requires a high level of technical expertise, "we must defer to the informed discretion of the responsible federal agencies." *Id.* (internal quotation marks omitted). The decision not to prepare an SEIS was not arbitrary or

capricious, *id.* at 377–78, 109 S.Ct. at 1861–62, and we will not set it aside.

## IV

### Section 4(f) Claims

Laguna contends that the FHA failed to comply with section 4(f) of the Transportation Act, 49 U.S.C. § 303(c), regarding the use of various parklands for the tollroad, including 1.7 acres of the reserve and 23 individual park properties.

Section 4(f) of the Transportation Act prohibits the FHA from approving any project that requires the use of publicly owned parkland, recreation areas, or wildlife and waterfowl refuges of national, state, or local significance unless (1) there is no prudent and feasible alternative to using such land and (2) the project includes all possible planning to minimize harm to the parkland. 49 U.S.C. § 303(c) (formerly codified at 49 U.S.C. § 1653(f)).

In 1991, Congress enacted section 1065 of the Intermodal Surface Transportation Efficiency Act of 1991 (ISTEA), Pub.L. No. 102–240, 105 Stat. 1914, 2005–2006, which exempts certain parks in the vicinity of the San Joaquin Hills transportation corridor from the requirements of section 4(f). Section 1065 provides that section 4(f):

> shall not be applicable to public park, recreation area, wildlife and waterfowl refuge (collectively referred to ... as "parkland")—
>
> (1) that are acquired by a public entity after a governmental agency's approval of a State or Federal environmental document established the location of a highway adjacent to the parklands; or
>
> (2) where the planning or acquisition documents for the parklands specifically referred to or reserved the specific location of the highway.

Pub.L. No. 102–240, § 1065(a). Section 1065 was enacted "in recognition of unique circumstances in Orange County, California, including a comprehensive land use planning pro-

---

12. In addition, the Corps conditioned its final approval on mitigation measures providing runoff and erosion control appropriate to conditions as they exist at the time of construction. *Id.*

Thus, vegetation in the burned area may have had a chance to grow back, lessening erosion and runoff, by the time the Corps issues its final approval.

cess [and] the joint planning of thousands of acres of parklands with the locations of the proposed highway improvement." *Id.* § 1065(c).

### A. The University of California, Irvine Reserve

 Laguna contends that the district court erred by finding that the 1.7 acres of the reserve that will be used for the tollroad were exempt from section 4(f) under section 1065 of ISTEA.

In 1989, the University adopted a long range development plan and accompanying EIR. In these documents, the University designated a parcel of approximately 60 acres to be set aside as an open space ecological reserve. AR 61:026785, 842. These documents and accompanying maps clearly refer to the proposed tollroad running along the south-southwest edge of the campus adjacent to the reserve. AR 61:026784, 797, 830; 243:099060. The plan anticipated that the tollroad would improve access to the campus from nearby coastal communities and reduce regional traffic congestion likely to result from the plan. AR 61:026810, 868; 243:099228. The record shows that the planning documents for the reserve referred to the location of the tollroad, and thus that the reserve is exempt from section 4(f) under the second condition of section 1065.

 Laguna contends that the planning documents do not "specifically refer to or reserve the specific location of the highway" as required by section 1065. It argues that the planning documents contemplated the tollroad as an off-site facility and did not specifically identify the location of the tollroad which requires destruction of a portion of the reserve. Laguna correctly points out that the maps in the plan and accompanying EIR show the tollroad located outside the campus running along the south-southwest

perimeter of the campus. The TCA, however, submitted public comments to the University regarding the location of the tollroad depicted in the plan. The TCA pointed out that the location depicted by the University, which avoided encroachment onto University property, might not be feasible, and that it might be necessary to select an alternate location which would require taking a portion of University property in order to avoid taking sensitive wetlands. AR 248:100870. The University publicly responded that it was strongly committed to working closely with TCA to develop an alternative route, using University property if necessary, to minimize overall environmental impact. AR 247:100535. Because the planning documents together with the accompanying public comments and responses specifically refer to the location of the tollroad, including the alignment using University property, we agree with the district court's conclusion that the reserve is exempt from section 4(f) under section 1065.[13]

### B. Other parkland properties

Laguna contends that 23 parkland properties will be used or impacted by the tollroad and that each of these parklands must be analyzed under the stringent requirements of section 4(f). Laguna contends that the district court erred in determining that ten of these properties were exempt from section 4(f) under section 1065, and that the district court erred when it failed to address the remaining 13 properties at all.

#### 1. The ten properties analyzed by the district court

In the EIS, the FHA identified ten properties that potentially would be used or constructively used by the tollroad. AR 31:013262–70.[14] In the Record of Decision, the FHA determined that these properties

13. Even if the reserve hadn't been exempted from section 4(f) by ISTEA, we would have to affirm the district court's ruling on this issue for an entirely independent reason. The FHA correctly determined that section 4(f) is inapplicable here, since the reserve does not function primarily as a "park, recreation area, or wildlife ... refuge" within the meaning of 49 U.S.C. § 303(c).

14. The ten potentially used properties are: Northwest Park; Oso Creek Corridor Open Space; Niguel Equestrian Trail; County of Orange Bicycle Trail No. 72; Aliso/Wood Canyons Regional Park; Aliso Creek Trail System; Sycamore Hills Open Space; Laguna Laurel Dedication Areas; Crystal Cove State Park; and Bommer Canyon Park.

were exempt from section 4(f) under section 1065 of ISTEA. AR 4:001388. The district court also concluded that these properties were exempt under section 1065. Laguna argues that the district court erred by concluding that these ten properties were exempt from section 4(f).

■ The district court concluded that nine of the properties were exempt under the first condition of section 1065 because they were acquired after the Orange County Board of Supervisors, in November 1979, approved EIR 267 and established the alignment of the tollroad. Laguna contends this conclusion is erroneous because EIR 267 did not establish a specific alignment but merely reviewed numerous alternative alignments and stated that the location of the tollroad alignment had not yet been determined and that further refinement would be necessary.

While EIR 267 evaluated numerous alternative alignments, the Orange County Board of Supervisors, in approving EIR 267, expressly adopted the recommendations and findings of the Orange County Planning Commission which identified the preferred route. AR 5:001422–24. This preferred alignment is, for all relevant purposes, the present alignment of the corridor in regard to its relationship to the park properties. Thus, the county's approval of EIR 267 established the location of the tollroad adjacent to the parklands sufficient to meet the requirements of section 1065. The record shows that nine of the ten properties were acquired after the approval of EIR 267 in 1979, and Laguna does not seriously dispute this finding.[15] Accordingly, we agree with the district court that these nine properties are exempt from section 4(f) under the first prong of section 1065.

■ The last property addressed by the district court is the Sycamore Hills Open Space. The court determined that the planning and acquisition documents for this prop-

erty refer to or reserve the location of the tollroad, and thus that the property is exempt under the second prong of section 1065. Laguna contends that the documents which identify the tollroad are merely general plans and do not specifically refer to or reserve the specific location of the tollroad sufficient to meet the requirements of section 1065. The planning and acquisition documents and maps for the Sycamore Hills Open Space, however, all refer to the specific location of the tollroad. AR 31:013267, 313–14; 212:087631; 206:085396–98; 213:087953–59, 969–70; 213:087632–53; 201:083141–49. These documents are sufficient to meet the requirements of the second prong of section 1065. We therefore affirm the district court's conclusion that all ten properties are exempt under section 1065 of ISTEA.

## 2. The remaining 13 properties

■ Laguna contends that the district court erred by failing to address its section 4(f) claims regarding 13 other park properties. In the EIS, the FHA found that the tollroad would not actually or constructively use 12 of these 13 properties. In the district court, Laguna did not challenge the FHA's "no use" determination for eight of these 12 properties, and it may not do so for the first time on appeal.

■ Laguna did raise challenges regarding the remaining five properties in the district court, and the district court failed to address these challenges. Nevertheless, we may affirm on any ground supported by the record. *Alexander v. City and County of San Francisco*, 29 F.3d 1355, 1359 (9th Cir. 1994). Accordingly, we now turn to Laguna's claims regarding these properties.

In the EIS, the FHA determined that certain properties would not be used by the tollroad and therefore did not require any section 4(f) analysis. AR 31:013250–60. La-

---

**15.** These nine properties are: Northwest Park (acquired 1992) (AR 31:013262–63; 254:102789–97); Oso Creek Corridor Open Space (acquired 1984) (AR 212:087631.1–31.14); Aliso/Wood Canyons Regional Park and Aliso Creek Trail System (acquired 1980) (AR 31:013277–78; 205:084540–96); Niguel Equestrian Trail (acquired 1985) (AR 195:081003–16.2); Bicycle Trail No. 72 (acquired 1987) (AR 219:090659–60); Laguna Laurel Dedication Areas (acquired 1991) (AR 31:013268; 253:102449–715); Bommer Canyon Park (acquired 1981) (AR 207:085777–862); and Crystal Cove State Park (acquired Dec. 1979) (AR 31:013284; 209:086276).

guna challenged the FHA's "no use" determination for four properties: three bike trails and a public park,[16] arguing that the tollroad will actually or constructively use the properties.

■ Section 4(f) applies to constructive use as well as actual use of parkland. *Sierra Club v. Department of Transportation*, 948 F.2d 568, 573 (9th Cir.1991). "[C]onstructive use of park land occurs when a road significantly and adversely affects park land even though the road does not physically use the park." *Id.*

■ Here, the project will result in the following impacts on the four properties challenged by Laguna: construction of an overpass over one bike trail; widening of an existing highway bridge over one bike trail; relocation of one bike path within the designated right of way for the bike path; and location of the corridor adjacent to the park. We have reviewed the findings of the FHA as set forth in the EIS regarding the tollroad's impact on these four properties. *See* AR 31:013253–58. We agree with the FHA's conclusion that the project will not substantially impair the current features, activities and attributes of these parklands. Accordingly, we uphold the FHA's determination that these properties will not be actually or constructively used and therefore that section 4(f) does not apply to these properties.

■ The last property at issue is the Rancho Viejo Bicycle Trail. It is not disputed that this property will be actually used by the tollroad. AR 31:013262. The FHA performed a section 4(f) analysis regarding this property and concluded that there was no prudent and feasible alternative and that all possible planning to minimize harm had been performed. AR 31:013270–71; 4:001389.

We have reviewed the FHA's section 4(f) analysis to determine whether the decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Stop H–3 Ass'n*, 740 F.2d at 1449. We hold that the FHA properly concluded that there were no prudent and feasible alterna-

tives to using this property and that the project includes all possible planning to minimize harm. *See* 49 U.S.C. § 303(c). We therefore affirm the judgment of the district court on all of Laguna's section 4(f) claims.

## CONCLUSION

The judgment of the district court is AFFIRMED. This court's injunction is dissolved upon issuance of the mandate.

---

**16.** Arroyo Trabuco Equestrian Trail/County of Orange Bicycle Trail No. 81; County of Orange Bicycle Trail No. 66; Bonita Creek Park; and San Diego Creek/Santa Ana Heights Equestrian Trail/County of Orange Bicycle Trail No. 40.